**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FRANI FEIT, INDIVIDUALLY AND AS ASSIGNEE OF IRWIN J. FEIT, : : : Plaintiff, : v. : : GREAT-WEST LIFE AND ANNUITY : INSURANCE COMPANY, A Colorado : Corporation : : Defendants. : : | Hon. Harold A. Ackerman<br><br>Civil Action No. 03-2948 (HAA)<br><br>**OPINION AND ORDER** |

Michael J. Epstein, Esq.
Epstein Beirne, P.A.
340 West Passaic Street
Rochelle Park, New Jersey 07662
*Attorneys for Plaintiff*

Michael J. Zaretsky, Esq.
Chorpenning, Good, Carlet & Garrison, Esqs.
1135 Clifton Ave.
Clifton, NJ 07015
*Attorneys for Defendant*

**ACKERMAN, Senior District Judge:**

This matter comes before the Court on a motion *in limine* filed by Defendant Great-West Life and Annuity Insurance Company ("Great-West"). Great-West seeks to exclude the expert reports and testimony of two experts, Dr. Duc Duong, M.D. and Dr. Arthur P. Fisch, M.D., proffered by Plaintiff Frani Feit ("Mrs. Feit" or "Plaintiff"). For the following reasons, Great-West's motion to exclude expert testimony is GRANTED IN PART and DENIED IN PART with respect to the testimony of Dr. Duong, and DENIED with respect to the testimony of Dr. Fisch.

1

*Background*

The background facts for this motion are taken in part from the stipulated facts submitted as part of the Final Pretrial Order in this action, and in part from the papers submitted by the parties regarding Great-West's summary judgment motion, which was largely premised on a challenge to the admissibility of the reports of Plaintiff's medical experts. The deceased, Dr. David Feit ("Dr. Feit"), was a practicing dentist and a member of the American Dental Association ("ADA"). Plaintiff Frani Feit is the surviving spouse of Dr. Feit and one of two designated beneficiaries of Dr. Feit's life insurance policy. Mrs. Feit is proceeding in this action individually and as the assignee of the rights of Irwin Feit, Dr. Feit's father, the other designated beneficiary of the policy.

The ADA maintained the life insurance benefits at issue under a group term life insurance plan provided by Great-West. Dr. Feit had a $1,000,000 group term life insurance policy at the time of his death and an additional $1,000,000 accidental death benefit. Under the terms of Dr. Feit's insurance policy, in order to receive the accidental death benefit, an insured's death must be the result of a bodily injury that is caused solely by accidental means. Under the policy's terms, Great-West was obligated to pay the additional accidental death benefit only if death occurred within 90 days of an accident, was a direct result of an accident, and was unrelated to any other cause. According to the language of the policy, the accidental death benefit would not be paid if the member's death was in any way connected to a disease, illness, or physical or mental infirmity, including the medical or surgical treatment of any disease or illness.

Dr. Feit died on July 22, 2002 in Rockland County, New York. The cause of death is the central matter of dispute in this case. At the time of his death, Dr. Feit was forty-four years old, did not smoke, and had no history of cardiac disease or illness, other than an elevated cholesterol level which was controlled with medication. He regularly walked five miles four to five times per week and played basketball on Sundays.

Sometime during the morning of July 22, 2002, Dr. Feit's car drove off the southbound lane of a highway in Rockland County and crashed into and drove through the guardrail, causing damage to ten feet of the rail. The vehicle then went down a 670-foot grassy slope, struck a chain-linked fence, and stopped at the Spook Rock Industrial Park (the "Park"). The car damaged a sign and part of the fence, and parts of the vehicle were scattered throughout the car's path. The location of Dr. Feit's car was reported to police by the Park's construction manger at approximately 12:11 PM. Police were called to the scene, and upon investigation found that Dr. Feit had died in the car. Dr. Feit's body was found in the front seat area of the car, clutching his chest and biting his shirt. Dr. Feit did not appear to have worn a seat belt, and the air bags were not deployed. According to the report of the investigator for the Medical Examiner's Office for the County of Rockland, the position of Dr. Feit's body in the car upon discovery appeared as though the body had "bounced around" inside the car. (Aff. of Gina Goodreau, dated October 28, 2004 ("Goodreau Aff."), Ex. I at 2.)[1]

The Medical Investigator for Rockland County came to the scene of the accident and prepared a report. On July 23, 2002, Dr. Marcelo Zappi, M.D., a pathologist for the Rockland County Medical Examiner's Office, performed an autopsy on Dr. Feit. The pathology report

---

[1] This affidavit was filed in support of Great-West's motion for summary judgment.

prepared by Dr. Zappi described Dr. Feit's cardiac condition as follows: "Cardiac atherosclerosis, moderate to severe. Myocardial fibrosis. Myocardial fiber fragmentation with loss of nuclei and striations. Patchy interstitial hemorrhage and lymphocytic infiltration, mild." (Goodreau Aff., Ex. G at 5. The autopsy results indicated that Dr. Feit died from a "myocardial infarction, old due to atherosclerotic obstruction of coronary arteries." (Goodreau Aff., Ex. G at 4; Ex. C.) There is no mention in the report of any examination of Dr. Feit's head or nervous system.

The beneficiaries submitted claim forms to Great-West in August 2002, seeking the full $2,000,000 in available benefits. Great-West replied by letter dated August 15, 2002, enclosing payment of the beneficiaries' respective shares under the life insurance policy, and stating that the accidental death claim was rejected because Mr. Feit's death certificate listed "natural cause," rather than accident, as the cause of death. Great-West further stated in the letter that it would reconsider the accident benefit portion of the claim if additional proof was submitted. Mrs. Feit responded to Great-West with copies of the autopsy report, accident report, EKG report from Dr. Feit's cardiologist, and correspondence from Dr. Feit's car insurance company indicating that his vehicle was totaled in the crash. Great-West submitted this information to a Great-West consulting physician, who rendered a report on October 30, 2002. The consulting physician's report reaffirmed the autopsy finding and stated that complications of the myocardial infarction caused Dr. Feit's death, and thus the consulting physician rejected any assertion of accidental death.

On October 31, 2002, Great-West's claim analyst wrote to Mrs. Feit again rejecting the accidental death claim, citing to: (1) Dr. Feit's death certificate, which stated the manner of death as "natural cause"; (2) the autopsy report, which supports the finding of death due to natural

4

causes; (3) the autopsy report's absence of any findings of bone fractures or trauma; and (4) the accident report's citation of "heart attack" as the cause of death. (Goodreau Aff., Ex. L.)

Mrs. Feit commenced this suit on May 15, 2003 in the Superior Court of New Jersey, Passaic County.  Defendant Great-West removed the action to this court in June, 2003, claiming diversity jurisdiction.  During discovery, Mrs. Feit provided pictures of the crash and named two expert witnesses.  Great-West deposed both experts, Dr. Arthur Fisch, M.D., a cardiologist, and Dr. Duc V. Duong, M.D., a forensic pathologist.  The reports of both experts attest that, given the circumstances of the crash, the manner in which the body was found, Dr. Feit's medical history, and the findings of the autopsy reports, Dr. Feit's atherosclerotic obstruction did not contribute to his death.

Dr. Fisch, Mrs. Feit's expert cardiologist, testified that he believed that a cardiac condition did not contribute to Dr. Feit's death. (Aff. of Michael J. Zaretsky, dated January 11, 2006 ("Zaretsky Aff."), Ex. A.)  Dr. Fisch based his opinion on his observations that (1) there was no evidence of myocardial infarction; (2) none of the obstructions in the coronary arteries exceeded 50%; (3) there was no thrombus or clot, which one would expect to find in the case of an acute myocardial infarction; (4) the heart was not particularly dilated; and (5) there was no history or symptoms of acute infarction or congestive heart failure. (Zaretsky Aff., Ex. A at 1.) Also, according to Dr. Fisch, Dr. Feit's past EKG reports were "within normal limits and without any evidence of a prior myocardial infarction." (*Id.*)

Dr. Duong, Mrs. Feit's expert pathologist, agreed with Dr. Fisch's opinion that 50% blockage in the coronary arteries does not usually cause a heart attack. (Zaretsky Aff., Ex.C at 2.) Also, in Dr. Duong's opinion, Dr. Feit's head and neck were not properly examined. (*Id.*)

5

Dr. Duong opined that "[i]n fatal cases in which no other evidence of injury can be found, consideration should be given to possible concussion of the medulla as the cause of death." *(Id.)* Dr. Duong concluded that Dr. Feit "died of head and neck injuries during the car accident." *(Id.)*

*Analysis*

**I.     Standard of Review Under** *Daubert*

The admissibility of "expert" testimony is a question of law governed by Rule 702 of the Federal Rules of Evidence and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). When faced with a challenge to expert testimony, a court must determine, pursuant to Rule 104(a) of the Federal Rules of Evidence, whether the testimony satisfies the standard of "evidentiary reliability" and whether it will assist the trier of fact to understand or determine a fact in issue.

Rule 702 provides that where

> scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

"Rule 702 imposes three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). First, the proffered witness must be a qualified expert, meaning that the witness must possess specialized expertise. Second, the testimony must be reliable. This has been interpreted

to mean that an "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 590). Third, the expert's testimony must "fit," meaning that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003)).

    *Daubert* represents the Supreme Court's definitive pronouncement on the nature of a Rule 702 inquiry. *Daubert* requires courts to perform a "gatekeeping function" to ensure the relevance and reliability of expert testimony, and in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court extended this gatekeeping obligation from scientific evidence to encompass all expert testimony. The Supreme Court in *Daubert* and the Third Circuit in *Paoli* announced factors for courts to consider in determining whether to admit expert testimony. These factors include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli*, 35 F.3d at 742 n.8. This list is "nonexclusive" and "each factor need not be applied in every case." *Elcock*, 233 F.3d at 746. Rather, the court must tailor its inquiry to the facts of each case and "should consider the specific factors identified in *Daubert* where they are reasonable

7

measures of the reliability of the expert testimony." *Kumho Tire*, 526 U.S. at 152. The proponent of expert testimony must establish the admissibility of the expert's opinion by a preponderance of the evidence. *Paoli*, 35 F.3d at 744.

In considering the reliability of an expert's testimony, the testimony need not be flawless for it to be reliable and admissible. As the Third Circuit has recognized,

> [t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.

*Paoli*, 35 F.3d at 744; see also *Crowley v. Chait*, 322 F. Supp. 2d 530, 536 (D.N.J. 2004) (noting that court may not substitute its own opinion for that of expert). Furthermore, the court's role as a gatekeeper "is not intended to serve as a replacement for the adversary system." Fed. R. Evid. 702, advisory committee's note. As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

However, courts need not admit bare conclusions or mere assumptions proffered under the guise of "expert opinions." While the inquiry as to reliability focuses "solely on principles and methodology, not on the conclusions that they generate," *id.*, the Supreme Court has recognized that "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Accordingly, when making a preliminary determination as to the admissibility of expert testimony, a court must engage in limited review

8

of an expert's conclusions "in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 152 (3d Cir. 1999). If a logical connection between the facts and the expert's opinion is lacking, the expert's testimony is properly excluded, as the Supreme Court has noted in *Joiner*:

> nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Joiner*, 522 U.S. at 146.

## II.     A *Daubert* Hearing is Not Necessary In this Case

The Third Circuit has long stressed the importance of holding *in limine* hearings in order to make the reliability determination required by *Daubert*. *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417 (3d Cir. 1999). An *in limine* hearing is designed to afford the deciding court access to a detailed factual record at the evidentiary stage. *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 272 (3d Cir. 1991). It is particularly important that the party defending the admissibility of evidence be given adequate chance to do so. *Paoli,* 35 F.3d at 739. As previously noted, the proponent of expert testimony bears the burden of establishing admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

An *in limine* hearing may be necessary where a court is inclined to exclude an expert's conclusions on the grounds that "the reasons and foundations for them are inadequately or perhaps confusingly explicated." *Padillas*, 186 F. 3d at 418. Yet an *in limine* hearing is not mandated in all cases in which a *Daubert* objection is raised to a proffer of expert evidence. *Id.*

Where the evidentiary record is substantial, in the form of expert reports and depositions, or the court has before it ample information from which to conclude that the expert lacks "good grounds" for his conclusions, an *in limine* hearing may be unnecessary. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 153 (3d Cir. 2000). Ultimately, the decision whether or not to hold a hearing rests within the sound discretion of the district court. *Id.*

Turning to the case before the Court, the Third Circuit's concern that the Court be furnished with an adequate factual record upon which to base its conclusions has been amply met. The parties have briefed the issues of admissibility of expert testimony in both the summary judgment context and in the instant *in limine* motion. Moreover, transcripts of the depositions of Plaintiff's experts have been previously provided to the Court, and those transcripts reveal that the Plaintiff's experts have had ample opportunity to respond to Defendant's challenges to their conclusions, analyses and methodologies, and to explain their methods and opinions.

In *Oddi*, the Third Circuit approved the district court's ruling on a *Daubert* challenge to expert testimony without first holding an *in limine* hearing. Noting the existence of ample deposition testimony explaining the expert's analysis, the *Oddi* court drew an analogy to the proceedings in *Kumho Tire*:

> In *Kumho Tire* the expert's proffered testimony was taken from deposition testimony. 526 U.S. at 142 ("The plaintiffs rested their case in significant part upon deposition testimony provided by an expert in tire failure analysis, . . .,who intended to testify in support of their conclusion."). In the district court, the defendants requested an *in limine* hearing to challenge the plaintiff's expert's proffered testimony. However, the district court refused that request, finding that two depositions submitted to it (one from the case before it and one from an unrelated case involving similar issues) were sufficient to allow an inquiry under *Daubert*. *See Carmichael v. Samyang Tires, Inc.*, 923 F. Supp. 1514, 1518 (S.C. Ala. 1996).

*Oddi*, 234 F.3d at 153-154.  The Supreme Court in *Kumho Tire* emphasized that the question of whether or not to hold a *Daubert* hearing is a matter within the district court's discretion:

> The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable. Our opinion in *Joiner* makes clear that a court of appeals is to apply an abuse-of-discretion standard when it reviews a trial court's decision to admit or exclude expert testimony. That standard applies as much to the trial court's decision about how to determine reliability as to its ultimate conclusions.

526 U.S. at 152 (citations and internal quotations omitted).

Likewise, in *Voilas v. General Motors Corp.*, 73 F. Supp. 2d 452, 455 (D.N.J. 1999), the district court rendered its *Daubert* decision without availing itself of an *in limine* hearing. Observing that, unlike in *Padillas*, the expert in *Voilas* had been given the opportunity to explain and even correct certain deficiencies, the *Voilas* court found that it had a sufficient factual record upon which to base its conclusions.  For similar reasons, this Court will rule on the *Daubert* motions before it without holding an *in limine* hearing.

### III.  Dr. Duc Duong, M.D.

Great-West has sought the exclusion of testimony from Plaintiff's proffered expert forensic pathologist, urging that Dr. Duong's conclusion regarding the cause of Dr. Feit's death is based upon mere speculation and assumption, and thus should not be presented to the jury.[2] For the following reasons, this Court agrees with this criticism and finds that Dr. Duong's

---

[2]  Great-West has not challenged the qualifications of either of Plaintiff's medical experts.

11

proffered opinion that Dr. Feit died of head and neck injuries sustained in the accident must be excluded from the trial of this action.

Dr. Duong's expert report notes that the autopsy performed by the Rockland County Medical Examiner's Office indicates that Dr. Feit's heart was of normal size and weight, showed no evidence of thrombi (blood clots), and demonstrated at most a 50% arteriosclerotic obstruction (narrowing of blood vessels). (Zaretsky Aff., Ex. C at 2.) Dr. Duong opines that "a 50% arteriosclerotic obstruction does not cause substantial reduction in coronary blood flow and does not cause a heart attack." (*Id.*)

Dr. Duong's expert report refers to the autopsy performed by the Rockland County medical examiner, noting that "[t]he head and neck were not properly examined." Dr. Duong then goes on to opine:

> Trauma to the head and cervical spine cannot be ruled out in a case such as this. Injuries to the neck, so called whiplash injuries are still common. Traumatic ponto-medullary tear associated with cervical hyperextension has been reported. Routine exploration at autopsy of the cervical spine in motor vehicle fatalities has showed a significant incidence of injury of the atlanto-occipital and atlanto-axial joints. In fatal cases in which no other evidence of injury can be found, consideration should be given to possible concussion of the medulla as the cause of death.

(*Id.*)

Noting that "Dr. Feit had been seen regularly by the cardiologist" and that "[p]hysical examinations and laboratory tests showed that he had been in excellent health prior to the accident," *id.*, Dr. Duong's report concludes with the following statement:

> I can state with a reasonable degree of medical certainty [that] Dr. Feit died of head and neck injuries during the car accident.

12

*Id.* This is the sum total of the analysis that Dr. Duong devotes to the question of Dr. Feit's cause of death. Thus, Dr. Duong's opinion on cause of death can be summarized as proceeding from a rejection of myocardial infarction as the cause of death, acknowledgment that a fatal car accident may, in the absence of external injuries, suggest head and neck injury as a possible cause of death, recognition that the autopsy did not include an examination of Dr. Feit's head or an internal examination of the neck or spine, and a conclusion that head and neck injury is in fact the actual cause of death. This conclusion is not supported by any further analysis or development, nor is it premised upon any medical findings of head or neck trauma. Indeed, Dr. Duong acknowledges that the medical examiner did not perform any examination of Dr. Feit's head, nor any internal examination of the neck.[3] Yet Dr. Duong nevertheless admitted that his conclusion of head and neck trauma was based on the autopsy report:

> Q: Doctor, you came to a conclusion in your report, and look at that page a second, with a reasonable degree of medical certainty, that Dr. Feit died of head and neck injuries, correct?
>
> A: Yes.
>
> Q: Was that based on the autopsy report?
>
> A: Yes.
>
> Q: What in the autopsy report indicates that the[re] were fatal head and neck injuries to Dr. Feit? Doctor I want you to look at the autopsy report now. I'm going to ask you, please, to look at the autopsy report. It is part of what we've marked as D-2 for identification today. Look at the autopsy report. Tell me what in the autopsy report indicates that there were, as you say, head and neck injuries that

---

[3] Dr. Duong did acknowledge in his deposition that the medical examiner performed a superficial examination of the neck.

        caused his death. Doctor, read the report, and I'm going to ask you to show me what page and what language indicates that there were head and neck injuries that caused Dr. Feit's death.

A: Yes. He did not examine the head and neck.

Q: Doctor, are you saying that you concluded from that autopsy report that head and neck injuries caused his death, because the coroner, the medical examiner, did not examine the head and neck?

A: Yes.

Q: And the only reason –

A: There's more reasons. There's more reasons.

Q: Let's take them one at a time. One of the reasons that you have concluded that head and neck injuries caused Dr. Feit's death is that the medical examiner did not – from the autopsy report, did not examine the head and neck, correct?

A: One of the reasons.

Q: What other reasons?

A: The other reason, his heart is normal. Normal. It is 400 gram heart, normal. And the occlusion of the coronary artery, 50 percent, is not severe. And there's no thrombi. There's no evidence of hypertrophy or dilation of any chambers. It's a normal heart. It is a normal heart.

He gives the cause of death myocardial infarction. Oh, something happened in the past. Oh, that means weeks or months ago. Obstruction of coronary artery – there's no obstruction of coronary artery. 50 percent occlusion is not severe obstruction.

So the cause of death is either the neck and head, because the doctor missed it. There's no cause here. This is not cause him death. This is an old one. Old cause.

14

>   Q:   Let's just be clear.  What you're saying, then, is you concluded that head and neck injuries caused Dr. Feit's death because you don't believe that there's any other cause of death indicated on the autopsy report, correct?
>
>   A:   Correct.
>
>   Q:   But there's nothing in the autopsy report that says that head and neck injuries caused his death, is there?
>
>   A:   Because he didn't do [the examination of head and neck], so how can he say?

Dep. of Dr. Duc Duong, Zaretsky Aff., Ex. D at 82:13 to 85:8.

Dr. Duong did not consider any other possible cause of death besides the rejected myocardial infarction theory and the conclusion of head or neck injuries that he espouses. Likewise, Dr. Duong does not describe any methodology for eliminating other potential causes in favor of the head and neck injury theory.  Aside from vague claims of "experience" and a superficial reference to journal articles abstracted from the internet, Dr. Duong provides no rationale or methodology for selecting head and neck injury as the cause of death.

In response to Great-West's challenge, Plaintiff does not offer any insight into Dr. Duong's analysis.  Rather, Plaintiff's defense of its expert consists of an assertion that because Plaintiff's case survived Great-West's motion for summary judgment, which was premised in part upon the vulnerability of Plaintiff's expert reports, Great-West's *in limine* motion to exclude Dr. Duong's testimony is somehow improper at this juncture.  This argument is specious.  The burden on a motion for summary judgment is carried by the proponent, who must prove that factual disputes do not exist and that judgment is proper as a matter of law.  However, upon a challenge to the admissibility of an expert, the proponent of the expert's testimony, Plaintiff here,

bears the burden of establishing the admissibility of the expert testimony. *Paoli*, 35 F.3d at 744. Plaintiff has not carried her burden of proving admissibility.

In the absence of any objective medical findings regarding head or neck injury, and without any analytical framework that would render the theory of possible head and neck injury a significant probability, let alone an uncontrovertible conclusion, Dr. Duong's opinion that Dr. Feit died of a head or neck injury is pure speculation, devoid of any discernible evidence or scientific method. Dr. Duong's conclusion that head or neck injury caused Dr. Feit's death is categorically a "net opinion," a theory "connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Thus, Dr. Duong's conclusion of death from head or neck injury lacks any indicia of reliability as is required for admissible expert testimony, and must be excluded from trial.

The remainder of Dr. Duong's expert report, which rejects a myocardial infarction as the cause of death, is similar to the expert opinion of plaintiff's cardiac expert, Dr. Fisch, and will be admitted for the reasons addressed below.

**IV.  Dr. Arthur P. Fisch, M.D.**

Great-West also challenges the admissibility of the testimony of Dr. Arthur P. Fisch, M.D., Plaintiff's expert cardiologist. Great-West acknowledges that Dr. Fisch's opinion criticizes and rejects the cause of death stated in Dr. Feit's death certificate (which listed the primary cause of death as "Myocardial infarction old"), but does not supply an alternative opinion on cause of death. Great-West asserts that because Dr. Fisch's opinion does not suggest an alternative cause of death, it lacks the necessary "fit" to make his testimony useful to the jury;

moreover, Great-West suggests that allowing Dr. Fisch to testify will only cause jury confusion because Dr. Fisch's opinion describes what is *not* the cause of death (heart attack or heart disease), and leaves the actual cause of death a matter of speculation.

Great-West does not challenge either Dr. Fisch's methodology or the logic by which his opinion flows from the autopsy evidence. Rather, Great-West asserts that Plaintiff's burden at trial is to prove that Dr. Feit died of an accidental cause, and because Dr. Fisch's opinion merely rejects the myocardial infarction theory but does not go so far as to suggest the actual cause of death, it will not assist the jury in their deliberations. In short, Great-West asserts Dr. Fisch's testimony is inadmissible because it does not resolve the ultimate issue in this action.

This argument fails, however, because Great-West misperceives the role of Dr. Fisch's expert testimony, and misperceives the role of an *in limine* motion. An expert opinion is not inadmissible because it may contain flaws, nor is it excludable because it provides testimony regarding only one facet or aspect of an action but does not prove the whole case; such vulnerabilities affect the weight of the testimony, not its admissibility. The Third Circuit spoke to this very issue in *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 152 (3d Cir. 1999). The Third Circuit noted:

> In *Daubert*, the Court noted that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," and that, even if expert testimony is admitted, summary judgment might be warranted if a party has still failed to present sufficient evidence to get to the jury. [*Daubert*, 509 U.S. at 596]; *see also Paoli*, 35 F.3d at 750 n.2. Clearly, the Court envisioned cases in which expert testimony meets the Daubert standard yet is "shaky" and cases in which admissible expert testimony provides only a "scintilla" of support for a claim or defense. Put differently, an expert opinion must be based on reliable

> methodology and must reliably flow from that methodology and the facts at issue – but it need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production.

*Id.*

Additionally, Great-West argues that to allow Dr. Fisch to testify at trial will only encourage the jury to speculate as to the cause of Dr. Feit's death, because Dr. Fisch has not opined about an alternative theory for the cause of Dr. Feit's death, and thus Dr. Fisch's rejection of the listed cause of death without a suggestion of an alternative will only lead to juror confusion in violation of Federal Rule of Evidence 403. This Court is unpersuaded by this argument. The best way to deal with the potential issue of juror confusion or speculation in this regard is to provide proper jury instructions, as indicated by *Daubert* and *Heller*. *Daubert*, 509 U.S. at 596; *Heller*, 167 F.3d at 152.

In light of the Supreme Court's instructions in *Daubert*, and the Third Circuit's pronouncements in *Heller*, Great-West's complaints regarding Dr. Fisch's testimony do not amount to proper grounds for exclusion. Dr. Fisch's report and testimony are therefore admissible in their entirety. Moreover, while this Court has deemed a portion of Dr. Duong's report and testimony inadmissible for baselessly concluding that a head or neck injury caused Dr. Feit's death, Dr. Duong's opinion and testimony regarding the rejection of a myocardial infarction as the cause of Dr. Feit's death is similar to the testimony offered by Dr. Fisch, and thus will be admissible to the extent Dr. Duong refrains from any mention or discussion of his opinion regarding head or neck injury as the cause of death.

*Conclusion*

For the foregoing reasons, it is on this 4th day of October, 2006, hereby ORDERED that Defendant Great-West's Motion In Limine to Strike or Preclude the Testimony of Plaintiff's Experts is GRANTED IN PART and DENIED IN PART.

1. To the extent that Dr. Duong's report concludes that Dr. Feit died of head or neck injuries sustained in the accident of July 22, 2002, it is barred, and a redacted version of the report shall be prepared it is to be offered as an exhibit at trial. Dr. Duong is barred from testifying regarding head or neck injuries as a possible cause of death. Dr. Duong shall be permitted to testify regarding his rejection of the medical examiner's conclusions regarding a cardiac condition or a myocardial infarction as the cause of death.

2. To the extent Defendant Great-West seeks to exclude Dr. Fisch's report and testimony, the motion is DENIED, and Dr. Fisch is permitted to testify to the matters described in his report.

Newark, New Jersey

s/Harold A. Ackerman, U.S.D.J.