**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| FRANI FEIT, INDIVIDUALLY AND AS : | |
| ASSIGNEE OF IRWIN J. FEIT, : | |
| : | |
| Plaintiff, : | Hon. Harold A. Ackerman |
| v. : | |
| : | Civil Action No. 03-2948 (HAA) |
| GREAT-WEST LIFE AND ANNUITY : | |
| INSURANCE COMPANY, a Colorado : | **OPINION & ORDER** |
| Corporation : | |
| : | |
| Defendant. : | |

---

Barry D. Epstein, Esq.
Epstein Beirne, P.A.
340 West Passaic Street
Rochelle Park, New Jersey 07662
*Attorneys for Plaintiff*

Michael J. Zaretsky, Esq.
Chorpenning, Good, Carlet & Garrison, Esqs.
1135 Clifton Ave.
Clifton, NJ 07015
*Attorneys for Defendant*

**ACKERMAN, Senior District Judge:**

This action came before the Court for a trial by jury on the issue of breach of contract and

the jury has rendered its verdict in favor of Plaintiff. This Court entered judgment on November

14, 2006. Now before the Court is Defendant's renewed motion for judgment as a matter of law,

or, in the alternative, for a new trial (Docket No. 59). For the following reasons, Defendant's

motion for judgment as a matter of law is granted and Defendant's motion for a new trial is

conditionally granted.

## *Background*

This action concerns the construction and application of an accidental death benefit clause contained in a life insurance policy issued by Defendant Great-West Life and Annuity Insurance Company ("Great-West"). The deceased, Dr. David Feit, was a practicing dentist and a member of the American Dental Association ("ADA"). Plaintiff Frani Feit (hereinafter "Plaintiff" or "Mrs. Feit") is the surviving spouse of Dr. David Feit and one of two designated beneficiaries of Dr. Feit's life insurance policy. Mrs. Feit is proceeding in this action individually and as the assignee of the rights of Irwin Feit, Dr. Feit's father, the other designated beneficiary of the policy.

The ADA maintained the life insurance benefits at issue, which were available to Dr. Feit under a group term life insurance plan provided by Great-West. Dr. Feit had a $1,000,000 group term life insurance policy at the time of his death and an additional $1,000,000 accidental death benefit. Under the terms of Dr. Feit's insurance policy, in order to receive the accidental death benefit, an insured's death must be the result of a bodily injury that is caused solely by accidental means. Under the policy's terms, Great-West was obligated to pay the additional accidental death benefit only if death occurred within 90 days of an accident, was a direct result of an accident, and was unrelated to any other cause. The accidental death benefit would not be paid if the member's death was in any way connected to a disease, illness, or physical or mental infirmity, including the medical or surgical treatment of any disease or illness.

Dr. Feit died on July 22, 2002 in Rockland County, New York. The cause of death is the

central matter of dispute in this case.  At the time of his death, Dr. Feit was forty-four years old,

did not smoke, and had no history of cardiac disease or illness.  He did, however, have an

elevated cholesterol level, for which he took medication for approximately two years prior to his

death.  His physician, Dr. Rosenthal, prescribed Lipitor for his cholesterol issue.  Aside from

that, Dr. Feit regularly walked five miles four to five times per week and played basketball on

Sundays.

Sometime during the morning of July 22, 2002, Dr. Feit's car drove off the southbound

lane of a highway in Rockland County and crashed into and drove through the guardrail, causing

damage to ten feet of the rail.  The vehicle then went down a 670-foot grassy slope, struck a

chain-linked fence, and stopped at the Spook Rock Industrial Park (the "Park").  The car

damaged a sign and part of the fence, and parts of the vehicle were scattered throughout the car's

path.  The location of Dr. Feit's car was reported to police at approximately 12:11 PM.  Police

were called to the scene and found Dr. Feit deceased, in the front seat area of the car, clutching

his chest and biting his shirt.  Dr. Feit did not appear to have worn a seat belt, and the air bags

were not deployed.  According to the report of Joseph Segelbacher, the investigator for the

County of Rockland Medical Examiner's Office, it looked as though Dr. Feit appeared to have

"bounced around" inside the car.  The car was totaled in the crash.  (Aff. of Gina Goodreau

("Goodreau Aff."), Ex. I at 2.)

After learning about the crash, Mrs. Feit and Dr. Feit's dental assistant, Joan Van Peenen,

went to the Rockland County Medical Examiner's Office to identify Dr. Feit's body.  Mrs. Van

Peenen was present when Mrs. Feit spoke to the medical investigator.  The substance of Mrs.

Feit's statements to the investigator is hotly debated, and Mrs. Feit offers Mrs. Van Peenen's

3

certification to support her version of the statements.  According to Mrs. Feit, in response to the

Segelbacher's questions, Mrs. Feit admitted that Dr. Feit "was a person who tended to sweat

profusely from time to time . . . and that he occasionally complained about back pain in the past,

which [she] believe[d] was related to his work."  (Certif. of Michael J. Epstein ("Epstein

Certif."), Ex. A ¶ 7.)  According to the medical investigator's report, Mrs. Feit "related her

husband had casually complained of chest and back pain with profuse sweating about one week"

prior to the crash. (Goodreau Aff., Ex. I at 3.)  Mrs. Van Peenen corroborated Mrs. Feit's

assertion to the medical investigator that Dr. Feit did not suddenly acquire these symptoms prior

to his death.

     The autopsy results and death certificate indicated that Dr. Feit died from a "myocardial

infarction, old due to atherosclerotic obstruction of coronary arteries."  (Goodreau Aff., Ex. G at

4.)  The autopsy results also revealed an atherosclerotic obstruction in both coronary arteries,

which reached a maximum degree of approximately fifty percent, and patches of thinning in the

myocardium.

     The beneficiaries submitted claim forms to Great-West in August 2002, seeking the full

$2,000,000 in available benefits.  Great-West replied by letter dated August 15, 2002, enclosing

payment of the beneficiaries' respective shares under the life insurance policy, and stating that

the accidental death claim was rejected because Dr. Feit's death certificate listed "natural cause,"

rather than accident, as the cause of death.  Great-West further stated in the letter that it would

reconsider the accident benefit portion of the claim if additional proof was submitted.  Mrs. Feit

responded to Great-West with copies of the autopsy report, accident report, EKG report from Dr.

Feit's cardiologist, and correspondence from Dr. Feit's car insurance company indicating that his

vehicle was totaled in the crash.  Great-West submitted this information to a Great-West consulting physician, P. Karakusis, M.D.,who rendered a report on October 30, 2002.  The consulting physician's report reaffirmed the autopsy finding and stated that it can be "reasonably inferred in the absence of other explanations for the insured's demise that complications of the [myocardial infarction] precipitated the insured's death . . . . As such, there exists no support for the assertion of accidental death." (*Id.*)  On October 31, 2002, Great-West's claim analyst wrote to Mrs. Feit again rejecting the accidental death claim, citing to: (1) Dr. Feit's death certificate, which stated the manner of death as "natural cause"; (2) the autopsy report, which supports the finding of death due to natural causes; (3) the autopsy report's absence of any findings of bony fractures or trauma; and (4) the accident report's citation of "heart attack" as the cause of death. (Goodreau Aff., Ex. L.)

Mrs. Feit commenced this suit on May 15, 2003 in the Superior Court of New Jersey, Passaic County.  Great-West subsequently removed the case to this Court pursuant to diversity jurisdiction.  Mrs. Feit's original complaint contained four counts.  She voluntarily withdrew two of the counts.  On October 18, 2005, this Court granted Great-West's motion for summary judgment as to one of the two remaining Counts, breach of the implied covenant of good faith and fair dealing.  Thus, the only remaining claim for trial was for breach of contract.

During discovery, Mrs. Feit provided pictures of the crash and named two expert witnesses, whose depositions were taken by Great-West.  Mrs. Feit's experts were Dr. Arthur Fisch, a cardiologist, and Dr. Duc V. Duong, a medical examiner.  The reports of both experts attested that, given the circumstances of the crash, the manner in which the body was found, Dr. Feit's medical history, and the findings of the autopsy reports, Dr. Feit's atherosclerotic

obstruction did not contribute to his death.  On October 5, 2006, pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), this Court issued an Opinion & Order excluding Dr. Duong's speculative testimony that Dr. Feit's cause of death was due to head and neck injuries. Dr. Duong was permitted to testify to other matters, namely his opinion that Dr. Feit did not die of a myocardial infarction.  In that same Opinion & Order, Dr. Fisch was permitted to testify that Dr. Feit did not die of a myocardial infarction.

The trial began on October 11, 2006.  On October 17, 2006, at the close of all evidence, Great-West renewed its motion for judgment as a matter of law; the Court reserved decision on the motion.  On October 19, 2006, the Court instructed the jury on the law governing the case to the jury, after which time the jury began its deliberations.

During the jury's deliberations, several written communications were transmitted from the jury to the Court.  The first communication on October 19 asked: "Please provide transcripts of Dr. Duoong's [sic] testimony."  (Jury Commc'n 1, Docket No. 43.)  After excising all side-bar conferences, the Court provided one copy of Dr. Duong's testimony.  Approximately two hours later, the jury, in its second communication, informed the Court: "We are stuck on question #1 and would like to adjourn for today.  We would start at 10am tomorrow."[1]  (Jury Commc'n 2, Docket No. 44.)  Before the Court had the opportunity to inform the jury that the jury's request would be granted, the jury transmitted a third communication: "Please clarify 'preponderance of evidence' and how that relates to evidence admitted vs. a lack of evidence to the burden of proof."  (Jury Commc'n 3, Docket No. 45.)  The Court granted the jury's request to adjourn for

---

[1] Question One on the verdict sheet stated: "Did the decedent, David J. Feit[,] sustain injuries caused by a July 22, 2002 motor vehicle accident?"

the day–Jury Communication # 2–but admonished the jury to refrain from revealing the status of its deliberations in future communications.  The Court provided a response to Jury Communication #3 on the following day, October 20, after hearing from counsel and noting objections.  Later on October 20, the jury transmitted its fourth communication to the Court: "May we have a copy of the judge's response to jury communication #3[?]"  (Jury Commc'n 4, Docket No. 46.)  The Court granted the jury's request and provided a written copy of the Court's response to Jury Communication #3.  Approximately one hour later, the jury transmitted its fifth communication: "Please provide a transcript of testimony of Dr. Zappi."  (Jury Commc'n 5, Docket No. 47.)  As with Dr. Duong's testimony, after excising the side-bars, the Court provided the jury with one copy of Dr. Zappi's testimony.  At approximately 1:05PM that same day, the jury transmitted its sixth communication: "We are unable to reach a unanimous verdict. Deliberation has failed to persuade any juror from their original position."  (Jury Commc'n 6, Docket No. 48.)  The Court then brought the jury back into the courtroom and charged the jurors with language for such an occasion that was specifically approved by the Third Circuit in *United States v. Fioravanti*, 412 F.2d 407 (3d Cir. 1969).  Later that same day, October 20, after receiving the *Fioravanti* charge, the jury returned a verdict in favor of Mrs. Feit.

### *Analysis*

As an initial matter, the Court recognizes the eminent place the jury occupies in our justice system.  As Justice O'Connor once noted, the "jury is the conscience of society."  *United States v. Bailey*, 444 U.S. 394, 434 (1980) (O'Connor, J., dissenting); *see also Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 129 (3d Cir. 2003) (noting the importance of the

jury's role).  It is no small task with which a jury is charged.  As most people likely understand, getting ten strangers to agree with each other on an issue of great importance without any meaningful remuneration is no mean feat.  Nevertheless, juries ably perform this task every day in this country and have done so for over 200 years.

Nevertheless, the Court must not shy away from its duty to protect the integrity of the justice system.  "Although the jury unquestionably has a more important role in the American jurisprudential system than in that of any other nation, its verdict is neither infallible nor immune from judicial scrutiny."  *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 159 (3d Cir. 2001).  The procedural mechanism in place to subject jury verdicts to judicial scrutiny comes by way of Federal Rule of Civil Procedure 50(b).  Pursuant to Rule 50(b), a court may direct entry of judgment as a matter of law, despite a jury's verdict to the contrary.  The court may direct such entry of judgment if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  Fed. R. Civ. P. 50(a).

The standard on a Rule 50(b) motion is similar to that for summary judgment such that the court should view the evidence in the light most favorable to the non-movant by giving the non-movant "every fair and reasonable inference."  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).  A Rule 50(b) motion should be granted sparingly, but "a scintilla of evidence will not enable the non-movant to survive" the motion.  *Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).  As the Third Circuit declared, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."  *Lightning Lube*, 4 F.3d at 1166.  In other words, a Rule 50(b) motion should be granted where

8

"the record is critically deficient of the minimum quantum of evidence" required to support the verdict. *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995). "In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Lightning Lube*, 4 F.3d at 1166.

### A. Burden Required to Support Jury's Verdict

In the instant matter, with respect to what evidential threshold was required to support the verdict the Court clearly instructed the jury that it was Mrs. Feit's burden to prove her case by a preponderance of the evidence:

> Ultimately, it is Mrs. Feit's burden to prove by a preponderance of the evidence that David Feit's death was caused by injuries from the accident; it is not Great-West's obligation or burden to disprove this, or to prove that David Feit's death was caused by a cardiac condition or other natural cause. Therefore, even if you do not believe that David Feit's death was caused by a cardiac condition, you may only deliver a verdict in favor of Mrs. Feit if she has proved by a preponderance of the evidence that the accident caused David Feit to suffer bodily injury which resulted in death.

(Jury Charge, Oct. 19, 2006 at 35:22-36:7.) Therefore, applying the standard of Rule 50(b) as interpreted by the Third Circuit, for this Court to set aside the jury's verdict, this Court must find that Mrs. Feit failed to prove by a preponderance of the evidence that her husband's death was caused by injuries from the accident. To be more precise, as a threshold matter the Court must determine whether Mrs. Feit proved by a preponderance of the evidence that Dr. Feit sustained *any* injury caused by the motor vehicle accident of July 22, 2002. This, in essence, was Question

One on the Verdict Form.

The Court is mindful of the fact that the Court should not "weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Lightning Lube*, 4 F.3d at 1166. As a result, the Court is also quite cognizant of the delicate inquiry it faces in determining whether Mrs. Feit adduced sufficient evidence for a reasonable jury to conclude in her favor without crossing into the forbidden territory of substituting the Court's opinion of the evidence for that of the jury's. To reiterate, the Court's opinion as to the persuasiveness of the evidence is wholly irrelevant to the legally objective task of determining whether Mrs. Feit has met her burden as a matter of law.

In opposition to this motion, Mrs. Feit does not direct the Court to any portion of any transcript from the trial from which a reasonable jury could conclude by a preponderance of the evidence that Dr. Feit suffered bodily injury. Instead, Mrs. Feit makes conclusory statements, such as "the circumstantial evidence is overwhelming that Dr. Feit's body suffered trauma and, therefore, bodily injury." (Pl.'s Br. in Opp. at 7.) In another instance, Mrs. Feit declares that "the jury clearly had enough evidence before it to conclude that David Feit must have suffered some bodily harm." (Pl.'s Br. in Opp. at 4.) The greatest specificity Mrs. Feit musters is in the statement that "[i]t is easy to see how the jury could have found bodily injury to David Feit, an unrestrained driver whose car left the road in either a roll-over or violent fashion and came to rest 670 feet down an embankment." (Pl.'s Br. in Opp. at 5-6.)

These conclusory statements are insufficient as a matter of law to establish that Mrs. Feit met her burden with respect to establishing that Dr. Feit suffered bodily injury. Moreover, Mrs.

Feit did not present any witness who testified that the car left the road in a "roll-over or violent fashion."  The rollover dispute stemmed solely from the fact that the first police officer dispatched to the scene, Trooper Polite, was told by the police dispatcher, who had no personal knowledge of the circumstances of the accident scene, that the officer was being sent to a "rollover" accident.  Why the police dispatcher made that statement is unclear, but there was absolutely no evidence presented from which a jury could reasonably conclude this was a rollover accident.

While Mrs. Feit failed to provide the Court with any citation to testimony that would support her argument on this motion, the Court has nevertheless endeavored to thoroughly review the testimony of every witness presented by both sides.  Essentially, Mrs. Feit's case at trial had two primary elements: (1) disprove that Dr. Feit died from a "myocardial infarction, old"; and (2) demonstrate that the autopsy performed by Dr. Zappi was deficient because he failed to fully examine the head and neck internally.

With regard to the first part of Mrs. Feit's trial strategy, both of her experts, Dr. Fisch and Dr. Duong, testified that the autopsy performed in this case did not explain the death of Dr. Feit.[2] Neither of Mrs. Feit's experts, however, testified to *any* conclusion as to cause of death.  The

---

[2]

|   |   |   |
|---|---|---|
| Q | Doctor, in your opinion, to a reasonable degree of medical probability, does the autopsy performed in this case explain the death of David Feit? | |
| A | No, it does not. | |

(Fisch at 94:7-10.)

|   |   |   |
|---|---|---|
| Q | Doctor, in your opinion, does the autopsy of David Feit explain his death? | |
| A | No. | |

(Duong at 65:20-22.)

following is excerpted from Dr. Fisch's testimony while on cross-examination by Great-West's

counsel:

> Q      And you disagree with the autopsy report.  Is that right?
>
> A      I disagree with the conclusion, not the actual report as to the findings.
>
> Q      And you disagree that the cause of death was myocardial infarction, old?
>
> A      Correct.
>
> Q      Or that it was caused by a coronary artery disease.  Is that correct?
>
> A      Correct.
>
> Q      And other than that, you've offered no other opinion as to Dr. Feit's cause of death.  Am I correct?
>
> A      Correct.

(Fisch at 100:10-21.)  As to Dr. Duong, he did have another opinion as to the cause of death, but

this Court excluded such testimony *in limine* in the Court's October 5, 2006 Opinion and Order

due to the unacceptably speculative nature of his methodology in reaching such a conclusion.  As

a result, at trial Dr. Duong simply testified that he did not believe Dr. Feit died from a

"myocardial infarction, old."

  Mrs. Feit pursued the second strand of her strategy by eliciting testimony from Dr. Duong

that he believed Dr. Zappi's autopsy was deficient in that it did not adequately examine the

internal portions of the head and neck.  The implication of such testimony, of course, is that

because a more thorough autopsy was not performed, Dr. Feit therefore suffered a head and neck

injury.[3]  Mrs. Feit attempted to buttress this argument-by-implication through cross-examination

---

[3]

> Q      But he [Dr. Zappi] did not do the head and the neck.  He did what you just described, but he did not include the head

of the medical examiner, Dr. Zappi, who performed the autopsy on Dr. Feit.[4]  After getting

————————————

and the neck.  He did not do an autopsy on the head and the
neck.  Correct?

A      Yes.

. . . .

Q      I take it that if you had performed this autopsy, you would
have included the head and the neck?  If you were doing
this autopsy in this case, would you have done the head and
the neck?

A      I always do the head and neck for all my cases, for all my
three thousand autopsies.  Also my other medical examiner
in the office . . . they [sic] always do the neck and the head.
. . . They [sic] don't do a partial autopsy.  Because if you
don't do complete, [sic] there will be more questions.

(Duong at 65:4-18.)

[4]

Q      Now, we know, we agree here that you did not do a head or
neck exam?

A      I examined the neck, but not the head.

. . . .

Q      You did not cut the neck open?

A      No.

Q      And you did not examine the head?

A      Well, I did remove the larynx and the tongue and the
trachea, et cetera, but we did not examine, do internal
examination of the vertebral column.

Q      Exactly my point.  You didn't do the spinal cord, the spinal
canal?

A      No, no, Externally, yes.

Q      All right.  And so you can't say to a reasonable degree of
medical probability that there wasn't some kind of a
cervical subluxation?

A      No.

Q      Do you know what a cervical subluxation is, correct?

A      Right.

Q      Cervical subluxation is a dislocation of the vertebra in
there, correct?

A      Well, if very subtle, it would have been overlooked, but a
gross subluxation, yes.  It would have manifested itself with
mobility and abnormal appearance of the vertebral column
of bones.

13

Q      Well, if you had autopsied the brain, there are things that you would look for in doing a brain autopsy, correct?

A      Yes.

Q      You would look for bleeding?

A      Yes.

Q      You would look for brain damage?

A      Yes.

Q      If you did the neck, you would look for whiplash injuries?

A      Yes.

Q      If you did the brain, you would look for subdural hematoma?

A      Yes.

Q      Which is bleeding under the base of the skull, correct?

A      Yes.

Q      The brain, you could look for a fracture?

A      Of the – if I removed the brain from the cranial vault.

Q      Yes.

A      Yes, but once again, fractures would have manifested themselves to a certain degree upon examination, because one palpates the scalp and can sense that there is unusual mobility of the bones that compose the cranial vault.  The same with the base of the skull and the same, once the neck organs are removed, you do – you palpate and rotate the head to see if there's anything unusual or noteworthy.  It's not overlooked completely.

Q      Not completely?

A      It's not overlooked completely.  You do – you try to discern whether you should continue and do an examination of the contents of the cranial vault.

       . . . .

Q      As a result of not doing an internal examination of the neck here, you could not determine whether there was a compression injury to the spinal cord?

A      True.

Q      You could not determine whether there was a subluxation of the spinal cord?

A      A very subtle, yes, I agree.

Q      And you agree that you would not see those types of injuries which I described unless the cervical spine, which is the neck, and the brain are opened?

A      Yes, but we were under the – I was under the idea that the family requested that we limit the autopsy to finding the

14

Dr. Zappi to admit that he had not done the most thorough internal examination of the head and neck, Mrs. Feit's counsel posed the following question to Dr. Zappi: "so you can't say to a reasonable degree of medical probability that there wasn't some kind of a cervical subluxation?," to which Dr. Zappi replied: "No." (Zappi at 156:10-13.)  Aside from the confusing double negatives, at first blush it appears that Dr. Zappi's answer would provide the requisite basis for a jury to conclude that Dr. Feit suffered some head or neck injury.  But upon further scrutiny, the requisite basis evaporates.

In this Court's October 5, 2006 Opinion & Order, as previously noted, this Court excluded Mrs. Feit's expert Dr. Duong from testifying to head and neck injuries as the cause of death.  Understanding that the standard of review is different, the Court nevertheless finds that Opinion illustrative here.  Specifically, this Court found that:

> Dr. Duong's opinion on cause of death can be summarized as proceeding from a rejection of myocardial infarction as the cause of death, acknowledgment that a fatal car accident *may*, in the absence of external injuries, suggest head and neck injury as a *possible* cause of death, recognition that the autopsy did not include an examination of Dr. Feit's head or an internal examination of the neck or spine, and a conclusion that head and neck injury is in fact the actual cause of death. This conclusion is not supported by any further analysis or development, nor is it premised upon any medical findings of head or neck trauma.

*Feit v. Great-West Life and Annuity Ins. Co.*, No. 03-2948, slip op. at 13 (D.N.J. October 5, 2006) (emphasis added).  This Court ultimately concluded that, "[i]n the absence of any objective medical findings regarding head or neck injury . . . Dr. Duong's opinion that Dr. Feit died of a

_____

cause of death.
(Zappi at 156:10-158:19.)

head or neck injury is pure speculation." *Id*. at 16.

At trial, Dr. Zappi's apparent admission that he could not rule out all cervical subluxation does not provide any more of a non-speculative basis for one to reasonably conclude that Dr. Feit died of a head or neck injury than the opinion espoused by Dr. Duong before trial.  Dr. Zappi's statement is far from a preponderance of the evidence establishing an injury.  Instead, such a statement is, at best, a mere scintilla of evidence and as such is insufficient, on its own, to support the jury's verdict.  *See Goodman*, 293 F.3d at 665.

At another point in the cross-examination of Dr. Zappi, the colloquy went as follows:

> Q     I'm asking you to assume and accept that if David Feit did not die of an old myocardial infarction, old as you described it, if that did not occur, would you then not agree that a head or neck injury would be the most likely cause of death?
>
> A     No.
>
> Q     So if it was not a heart attack, what was it?
>
> A     Perhaps some toxicological event.
>
> Q     So you would fall on toxicological event as opposed to the head or neck?
>
> A     There are many cases in which there are no anatomic findings, for instance drug overdoses, or very subtle findings where the final cause of death lies on the toxicology report.
>
>         ....
>
> Q     Since we have the benefit of a toxicology report, I'd ask you to accept that report that he didn't die from something toxicology related, he didn't die from a myocardial infarction, old, would you then agree with me, Doctor, that the likely cause of death was to the head or the neck?
>
>         ....
>
> A     It's possible.

(Zappi at 167:8-168-6.)  Possibilities, of course, do not create a preponderance.  *See Huddell v.*

16

*Levin*, 537 F.2d 726, 740 (3d Cir. 1976) (finding that District Court improperly instructed jury regarding the standard of proof and stating that "[a] plaintiff must prove his case by a preponderance of the evidence; proof of a 'substantial possibility' of survival does not comport with that affirmative burden"); *see also Newhouse v. Heckler*, 753 F.2d 283, 287 (3d Cir. 1985) (noting that a test that requires a "reasonable possibility" is a lower threshold than a preponderance of the evidence requirement).  Dr. Zappi testified that Dr. David Feit died of a cardiac event.  In an effort to extract a favorable response, Mrs. Feit's counsel posed the above hypothetical and initially did not receive the answer he was seeking.  As a result, Mrs. Feit's counsel created a more involved, or nested hypothetical, excluding Dr. Zappi's conclusions, in an effort to elicit the "head and neck" answer.  Ostensibly, Mrs. Feit's counsel would have continued refining this nested hypothetical until he obtained the desired answer.  Even so, Dr. Zappi's response was not to any degree of medical probability, as he was not called as an expert, and it merely opined an indeterminate possibility.  That too is insufficient as a matter of law to establish the requisite preponderance of the evidence upon which the jury's verdict should be based.  *See Huddell*, 537 F.2d at 740.

Finally, the following colloquy between Dr. Zappi and Mrs. Feit's counsel represents the last shred of evidence that even remotely hews closer to Mrs. Feit's argument that the verdict is properly supported by the requisite evidence:

> Q      You would agree that if he [Dr. David Feit] was bounced around during this motor vehicle accident and his head struck the inside of that car, there could well have been a head injury or neck injury, correct?
>
> A      If so, yes.
>
> Q      Okay.  Without doing a complete autopsy, you can't really

                    rule that out in this case?

A       I agree.

(Zappi at 172:20-173:4.)  Again, this amounts to speculation on the part of Dr. Zappi and falls

below the minimum quantum of evidence required to support the verdict.  *See Gomez*, 71 F.3d at

1083.  The Court concludes that Dr. Zappi's statement in this regard is speculation because it is

not based on any evidence presented that Dr. Feit indeed struck his head on the inside of the car.

        The Court again notes that, based upon this Court's own searching examination of the

record, the foregoing excerpts from the trial transcript represent the most favorable testimony for

Mrs. Feit's case.  Based upon a careful analysis of this, and all the evidence, the Court concludes

that Mrs. Feit failed to meet her burden to establish by a preponderance of the evidence that Dr.

Feit suffered any injuries, much less any injuries which caused his death.  The Court's conclusion

rests solely on the evidence presented by Mrs. Feit through direct examination of her own

witnesses and cross-examination of Great-West's.  In other words, the evidence presented by

Great-West, in an effort to establish a cardiac event as the cause of death, played no part in this

Court's evaluation of whether Mrs. Feit met her burden such that the jury's verdict could stand.

## B. The Jury Did Not Follow This Court's Instructions

        At its core, the problem with this case boils down to two primary failures.  First, Mrs. Feit

failed to present any evidence from which a jury could infer, by a preponderance of the evidence,

that Dr. Feit suffered any injury resulting from the auto accident which proximately caused his

death.  Second, the jury failed to follow this Court's clear and explicit instructions regarding

evaluation of the evidence.

The Court has already addressed the first issue regarding Mrs. Feit's failure to present the requisite evidence that could support the verdict and therefore the Court now turns to the second point. This Court's instructions as to what Mrs. Feit had to prove were clear and unambiguous:

> I instruct you that the terms of the policy, and the interpretation that New Jersey courts have put on some of those policy terms, requires that Mrs. Feit prove each of the following elements by a preponderance of the evidence in order to recover the accidental death benefit in this case: one, that David Feit sustained a bodily injury; two, caused by an accident; three, which injury resulted in his death; and four, death occurred within 90 days of the accident.

(Jury Charge, Oct. 19, 2006 at 33:19-34:2.)  With respect to explaining the "preponderance of the evidence" standard, this Court charged the jury as follows:

> The burden is on Mrs. Feit to prove each element of her claim by a preponderance of the evidence.  To prove "by a preponderance of the evidence" means to prove that something is more likely so than not so.  In other words, a "preponderance of the evidence" means that the evidence, when considered and compared with the evidence to the contrary, has more convincing force and produces in your minds a belief that what is sought to be proven is more likely true than not true.

(Jury Charge, Oct. 19, 2006 at 29:9-17.)  As noted previously, the jury, in its third communication to the Court during deliberations, made the following inquiry: "Please clarify 'preponderance of evidence' and how that relates to evidence admitted vs. a lack of evidence to the burden of proof."  (Jury Commun. 3, Docket No. 45.)  The Court provided the following response in both oral and written form:

> I have formulated the following response that I believe states the law and fairly responds to your request for clarification.  At the

19

outset, let me repeat my instructions from the charge that I read to you. To prove "by a preponderance of the evidence" means to prove that something is more likely so than not so. In other words, a "preponderance of the evidence" means that the evidence, when considered and compared with the evidence to the contrary, has more convincing force and produces in your minds a belief that what is sought to be proven is more likely true than not true.

That is what I told you when I instructed you on the law. Because you have asked me to clarify, I now offer you another way to think of preponderance of the evidence. I am sure you have heard of the concept of the scales of justice. If you were to put the Plaintiff's and the Defendant's evidence on opposite sides of the scales, the Plaintiff would have to make the scales tip somewhat on her side in order to satisfy her burden of proof. If the Plaintiff fails to meet this burden, the verdict must be for the Defendant. The Plaintiff does not need to make the scales tip completely on her side, but she must point to some evidence that is enough to tip the scales in her favor.

....

I reiterate what I told you in the charge, which is that . . . "Any factual determinations you make . . . should be based on a fair and dispassionate review of the evidence and not simply on the basis of conjecture or speculation."

....

What I mean by these two statements is that your decisions must be based only on the evidence admitted and the natural inferences to be drawn from the evidence. You may not use speculation or conjecture to "fill in the blanks" where there is an absence of evidence.

To continue with the scales of justice analogy, if there was a particular fact that it was necessary for a party to prove by a preponderance of the evidence in order to satisfy the burden of proof, and that party pointed to no evidence to prove that fact, there would be nothing on the scale to tip it in his or her favor, even if the opposing party had offered no competing evidence to disprove the fact.

(Jury Charge, Oct. 20, 2006 at 16:15-18-18.)

Despite this Court's articulation of the requisite standard that should have guided the

jury's deliberations, the jury nonetheless must have resorted to speculation and conjecture in an

20

effort to fill in the blanks with evidence that Mrs. Feit failed to present or establish by reasonable inference. The evidence overwhelmingly demonstrated that Dr. Feit did not suffer any bodily injuries as a result of the accident. *See* (Segelbacher at 33:13-15 (no visible trauma or injury noticeable on Dr. Feit).); (Polite at 55:24-56:11 (no cuts, abrasions, lacerations, etc.).); (Zappi at 120:19-127:24 (describing autopsy procedure and findings in which no injuries are indicated, either external or internal, including palpation of the head and neck that failed to indicate anything out of the ordinary).); (Polite at 52:18-53:1 (declaring that there was no damage to the roof of the car to indicate a rollover).); (Segelbacher at 23:19-24 (noting the car had no damage to the roof, hood or other surfaces to indicate a rollover).); (Mrs. Feit at 128:25-131:4 (failing to recall from memory or identify in photos any breakages on the car).) But even if the jury rejected every shred of evidence demonstrating the lack of bodily injury to Dr. Feit, Mrs. Feit still failed to present any evidence from which a jury could reasonably infer that Dr. Feit did in fact suffer such injury. For the jury to have answered Question One on the Verdict Form in the affirmative as it did, the only reasonable explanation is that the jury improperly resorted to speculation and conjecture, contrary to the explicit directive of this Court and the law.[5]

It is entirely reasonable that the jury fully believed Mrs. Feit's experts Dr. Fisch and Dr. Duong when they testified that Dr. Feit's cause of death was not a cardiac event. *See* (Fisch at 92:17-25; 95:2-7); (Duong at 60:10-11; 63:1; 73:16-19.) But because Mrs. Feit failed to adduce any evidence from which a reasonable jury could conclude that Dr. Feit suffered any bodily injury, much less that such injury was the proximate cause of his death, the mere fact that Mrs.

---

[5] Question One on the verdict sheet stated: "Did the decedent, David J. Feit[,] sustain injuries caused by a July 22, 2002 motor vehicle accident?"

Feit may have successfully disproved cardiac event as the cause of death does not by itself establish a bodily injury which caused death, as required by the policy.  Instead, by disproving cardiac event as the cause of death, Mrs. Feit created an opening, or a "blank," that provided her the opportunity to establish bodily injury as a cause of death.  However, as noted throughout this Opinion, Mrs. Feit entirely failed to provide that quantum of evidence sufficient to tip the scales in her favor sufficient to support the jury's verdict.  *See Gomez*, 71 F.3d at 1083.  With that void created, but left unfilled by Mrs. Feit, the jury, in an unenviable position, apparently tried to divine a cause of death for Dr. Feit.  This is precisely what the Court directed the jury to refrain from doing.  Fortunately, however, the procedural mechanism of Rule 50(b) is specifically designed to remedy such jury errors.

In drafting the jury instructions, this Court relied substantially upon the Third Circuit's decision in *Murray v. United of Omaha Life Ins. Co.*, 145 F.3d 143 (3d Cir. 1998).  Specifically, this Court utilized *Murray* for the law regarding the relevance of a pre-existing condition to recovery under an accidental death benefit policy.  While *Murray* proved instructive in that regard, the Court hastens to note that the Third Circuit's opinion is also instructive for the instant motion because the *Murray* court reversed the district court's granting of defendant's motion for judgment as a matter of law after the jury returned a verdict in favor of the plaintiff.  *Id*. at 157.

In *Murray*, Mr. Murray, 71-years-old, was admitted to a hospital for problems related to swelling and pain in his foot.  *Id*. at 146.  After the foot became gangrenous, it was amputated.  For several weeks following the foot amputation surgery, Mr. Murray remained in the hospital with a fever.  *Id*.  Eventually the fever broke and he was scheduled to be discharged, but the fever returned on his scheduled discharge day and therefore he stayed in the hospital.  *Id*.  That

22

evening, while returning from the bathroom, he fell and broke his hip.  *Id*.  Approximately ten

days later he had hip surgery, but his overall condition worsened and he subsequently died about

three weeks afterwards.  *Id*.  Prior to entering the hospital, Mr. Murray had suffered from various

ailments, including heart problems and kidney disease.  *Id*. at 146-47.  But plaintiff's expert

testified that all of these "pre-existing conditions" were under control at the time he went into the

hospital for treatment of his foot.  *Id*. at 147.

The primary issue on appeal was whether Mr. Murray's pre-existing conditions should

have been allowed to factor into the cause of death analysis.  The district court determined that

Mr. Murray's pre-existing conditions precluded recovery under the policy.  Writing for the court

of appeals, Judge Becker concluded that the district court erred in granting judgment for the

defendant because Mr. Murray's "death could be found by the jury to be proximately caused by

an 'accident and independent of all other causes' within the stipulated limited coverage clause of

the policy," if the jury concluded that the fall resulting in his broken hip exacerbated those pre-

existing conditions.  *Id*. at 156.

This Court views the facts of *Murray* as readily distinguishable.  In *Murray*, there was no

dispute that Mr. Murray fell and broke his hip.  That is, he suffered a clearly identifiable injury.

The question, therefore, was whether his death proximately resulted from the "cascade of events"

triggered by the fall.  *Id*. at 147.

The issue in the instant matter is much more basic and preliminary.  The question here is

whether Dr. Feit actually suffered any injury at all, i.e., was there even a "trigger."  Before the

jury here could reach the question of whether Dr. Feit had a pre-existing condition that was

exacerbated by the bodily injury, the jury had to find, by a preponderance of the evidence, that

Dr. Feit actually sustained a bodily injury sufficient to exacerbate any pre-existing condition.  As

this Court has already found, Mrs. Feit has merely suggested the possibility of an injury and

nothing more.  Therefore, the Court concludes that *Murray* does not prevent this Court from

setting aside the jury's verdict and granting judgment to Great-West.

Because Mrs. Feit failed to prove bodily injury by a preponderance of the evidence and

thus failed to produce evidence sufficient to support the jury's verdict, the Court will grant Great-

West's renewed motion for judgment as a matter of law and enter judgment in favor of Great-

West.

### C. Alternative Motion for a New Trial is Conditionally Granted

Pursuant to Federal Rule of Civil Procedure 50(c)(1), this Court must rule on Great-

West's motion for a new trial, despite the fact that the Court will grant Great-West's motion for

judgment as a matter of law.  Rule 50(c)(1) provides:

> If the renewed motion for judgment as a matter of law is granted, the
> court shall also rule on the motion for a new trial, if any, by
> determining whether it should be granted if the judgment is thereafter
> vacated or reversed, and shall specify the grounds for granting or
> denying the motion for the new trial. If the motion for a new trial is
> thus conditionally granted, the order thereon does not affect the
> finality of the judgment. In case the motion for a new trial has been
> conditionally granted and the judgment is reversed on appeal, the new
> trial shall proceed unless the appellate court has otherwise ordered.

Fed. R. Civ. P. 50(c)(1).  The threshold for granting a new trial is somewhat lower than that

required for granting judgment as a matter of law.  *See Brennan v. Norton*, 350 F.3d 399*, 430 (3d

24

Cir. 2003) (noting that a new trial may be granted even when a motion for judgment as a matter

of law is denied); *Wagner by Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir.

1995) (same); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 735 (3d Cir. 1988) (same).  A new trial

may be granted, pursuant to Rule 59(a), "for any of the reasons for which new trials have

heretofore been granted in actions at law in the courts of the United States."  Fed. R. Civ. P.

59(a).  "The authority to grant a new trial . . . is confided almost exclusively to the exercise of

discretion on the part of the trial court."  *Brennan*, 350 F.3d at 430.

Despite Rule 59(a)'s dearth of instructive specificity, our Court of Appeals has

recognized, *inter alia*, that a new trial may be granted only when the jury's verdict is contrary to

the weight of the evidence such that allowing the verdict to stand would constitute a miscarriage

of justice.  *See Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991); *see also*

*Brennan*, 350 F.3d at 430; *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001).

In her opposition to this motion, Mrs. Feit recognizes that it was her burden to "prove

bodily injury by accidental means that results in or contributes to death."  (Feit Br. in Opp. at 10.)

Great-West, in its motion for judgment as a matter of law, moves, in the alternative, for a new

trial on the basis that the jury's finding of a bodily injury was against the weight of the evidence.

Again, as with the Rule 50(b) motion, this Court should not engage in substituting its own

judgment of the facts for that of the jury's.  However, the very nature of assessing whether the

verdict goes against the weight of the evidence necessitates that the Court perform some

valuation of that evidence.

The Court has already analyzed all the evidence that favors Mrs. Feit for a finding that

Dr. Feit suffered bodily injury and the Court thereafter concluded that the evidence was insufficient as a matter of law to support such a finding.  In reaching that conclusion, this Court did not view such lack of evidence establishing bodily injury against the backdrop of Great-West's evidence contradicting any alleged bodily injury.  Here, however, it is useful to look at Great-West's evidence in greater detail to determine whether the verdict, considering all the evidence, goes against the weight of the evidence in such a manner that to sustain the jury's verdict would constitute a miscarriage of justice.

At least three people called to testify in this case saw Dr. Feit's body after he died.  Some of those same people saw his car as well and testified to its condition.  The first person to find Dr. Feit in his car that fateful day was Harold Klineberger, but he was not called to testify.  Mr. Klineberger allegedly is the individual who made the 911 call to the local police department indicating that there was a vehicle off the roadway with a person inside.

New York State Trooper Darryl Polite was the first official on the scene, responding to the 911 call.  Trooper Polite testified at trial that he saw Dr. Feit in the vehicle and that he did not recall, or note in his report, any cuts, lacerations, abrasions, or bruises on Dr. Feit's body.  (Polite at 55:24-56:11.)

In addition to Trooper Polite, Rockland County (New York) Medical Investigator Joseph Segelbacher viewed Dr. Feit both at the scene and at the medical examiner's office.  Segelbacher testified that he did not notice any evidence of trauma or injuries to Dr. Feit's body at the scene, where Segelbacher performed an "overall visual observation."  (Segelbacher at 30:10-15.) Segelbacher testified that, generally speaking, medical investigators try to determine at the scene

26

whether there is any trauma to the body.  Segelbacher stated that, for example, "[i]f someone was

to receive an impact injury to the chest, we would want to look at the steering wheel . . . [to] look

for causal effect."  (Segelbacher at 30:25-31:2.)  Great-West's counsel specifically asked

Segelbacher: "Did you note anything on the interior or anything on the car that would indicate an

impact on the body with any part of the car?"  (Segelbacher at 31:9-11.)  Segelbacher replied:

> I didn't see any damage to the interior of the car. . . . His body was
> positioned directly in the driver's seat when I saw him.  His lower
> legs were in the driver's compartment, and one leg was up against –
> the shifter was in neutral, the keys were in the on position.  The car
> was out of gas.  It was not running at the time.  But there was no
> damage per se to suggest that there was a traumatic event inside the
> car.

(Segelbacher at 31:12-32:5.)  After this visual observation at the scene, Segelbacher examined

Dr. Feit's body again, from head to toe, back at the examiner's office under better lighting.

Again, Segelbacher did not note any trauma or injury of any kind to Dr. Feit's body.

(Segelbacher at 32:6-15.)

As previously noted, Dr. Marcelo Zappi, while working for the Medical Examiner's

Office in Rockland County, New York, performed the autopsy on Dr. Feit.  Zappi testified that

the he began the autopsy of Dr. Feit with an external examination in which he inspected "the

head, the ears, the eyes, the nose, the mouth, the breast, genitalia as well as upper and lower

extremities and the back.  The inspection is visual as well as through palpation."[6]  (Zappi at

---

[6]    Q    Can you explain what palpation is?
       A    Palpation [is,] essentially[,] with hand contact[,] try[ing] to discern
            anything unusual, anything noteworthy that could escape the simple visual
            examination.
(Zappi at 120:24-121:2.)

120:19-23.)  In response to a question regarding his visual examination of Dr. Feit, Zappi replied:

> It was essentially negative.  There were no noteworthy findings to
> report insofar as any injuries or any fractures, abrasions, lacerations,
> lesions in the mouth, nose, ears and mouth.  Externally obvious.  The
> eyes seemed unremarkable.  I mean, no, nothing unusual that would
> raise suspicions of any type of trauma.

(Zappi at 121:18-23.)  Zappi further testified that through moving the body's limbs, he was

unable to discern any unusual movement that would indicate any trauma.

Zappi also testified to the internal part of the autopsy he performed on Dr. Feit, during

which Zappi examined, among other things, the lungs, kidneys, bladder, prostate, spleen,

adrenals, thyroid, liver, stomach, pancreas, and heart.  In addition, Zappi testified that there was

"no hemorrhage to the thoracic musculature," explaining that such a conclusion "reflects that

there was no trauma to the chest, no fractured ribs or blood that seeps into the muscle

surrounding the ribs."  (Zappi at 125:14-18.)  Moreover, Zappi specifically noted in his autopsy

report that neither the thoracic nor abdomenal cavity contained any excess fluid.  Upon

questioning regarding such a conclusion's significance, Zappi explained that if he had found

excess fluid or hemorrhaging such "would be reflective of either a ruptured organ or a severed

vessel . . . trauma, in other words."  (Zappi at 125:19-126:2.)

Trooper Polite, Medical Investigator Segelbacher, and Dr. Zappi all viewed or examined

the body of Dr. Feit and all testified that there was absolutely no indication of any trauma or

injury suffered by Dr. Feit.  No witness testified to anything even remotely contrary to these three

witnesses regarding bodily injury.  The evidence at trial was overwhelming and unrefuted that

Dr. Feit did not suffer any bodily injury as a result of the accident.

As Mrs. Feit acknowledges, to recover under the policy she had to "prove bodily injury by accidental means that results in or contributes to death."  (Feit Br. in Opp. at 10.)  To allow the jury's verdict to stand on this point would be to require Great-West to pay an award based upon not even a shred of evidence that Dr. Feit received *any* bodily injury as a result of the automobile accident.  New Jersey law, in the area of insurance policy interpretation, recognizes that the insurer is in a better bargaining position by virtue of having drafted the policy language.  As a result, the insured's reasonable expectations are taken into account when interpreting the policy.  Nevertheless, it would constitute a grave miscarriage of justice to extend the doctrine of reasonable expectations to such an extreme as to allow a jury to conclude that there has been bodily injury in a case such as this where *all* the evidence strongly indicates that a prerequisite to recovery under the policy, bodily injury, simply does not exist.  Even giving the benefit of policy interpretation to Mrs. Feit, this Court cannot allow the jury's verdict to stand given that it is manifestly contrary to the weight of the evidence to such a degree as to constitute a grave miscarriage of justice. *See Williamson*, 926 F.2d at 1352.  Therefore the Court will conditionally grant Great-West's Rule 50(c) motion for a new trial, conditioned upon a reviewing Court's reversal of this Court's ruling on the motion for judgment as a matter of law.

### *Conclusion & Order*

For the foregoing reasons, Great-West's renewed motion for judgment as a matter of law

(Docket No. 59) is hereby GRANTED.  Judgment is hereby ENTERED in favor of Great-West.

Furthermore, Great-West's motion for a new trial is CONDITIONALLY GRANTED.

Dated: January 26, 2007
Newark, New Jersey

/s/ Harold A. Ackerman
U.S.D.J.